Frank Liu

304 S. Jones BLVD #3416

Las Vegas, NV 89107

(702) 861-3154

frank.liu.96@gmail.com

Pro Se Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

**Frank Liu**                                    **Case No:  3:22-cv-00551-ART-CLB**

304 S Jones BLVD. #3416 Las Vegas, NV 89107

    Plaintiff,                              **AMENDED COMPLAINT**

   vs.

                                        **DEMAND FOR JURY TRIAL**

**City of Reno and Scott Gauthier**

address for City of Reno (a municipality):

1 E First St.

Suite 300

Reno, NV 89501

775-334-4636

address for Scott Gauthier (an individual):

Reno Police Department

455 E 2nd St.

Reno, NV 89502

775-334-2121

    Defendants.

# Table of Contents

Table of Authorities……………………………………………………………….. ii, iii

Introduction………………………………………………………………………... 1

Jurisdiction and Venue…………………………………………………………….…1

Parties…………………………………………………………………………...…..2-

Background…………………………………………………………………………..2

Legal Argument……………………………………………………………………..5

Why Qualified Immunity Does Not Apply………………………………….…...… 7

How the Eighth Amendment Applies…………………………………………...…..8

Reno Police and City Illegal Harassment of Vulnerable Population…………………..10

Why City of Reno is a Proper Defendant …………………………………………11

Official Written Policy …………………………………………………………..…12

Official City Ordinances to Target the Homeless …………………………………...13

City's Failure to Train or Supervise ………………………………………………14

Lack of Auditing Supervision ……………………………………………………..17

Reno PD Formal Complaint Policy…………………………………………………..19

Elijah McClain and the escalation of Unlawful Detention …………………………...20

Past Racist Behavior of Reno Law Enforcement ………………………………..22

ACLU on Reno ……………………………………………………………………...22

Reno Policies that Disregard the Poor ……………………………………………...23

New Reno city manager Doug Thornley on budget shortfall, police funding and

homelessness ………………………………………………………………………23

Homeless seen as a Problem and not as Constituents (Voting Rights) ………………..24

Conclusion of Why City of Reno is A Proper Defendant ……………………………..24

Proof of Encounter……………………………………………………………………24

Cause of Action……………………………………………………………………...…26

Jury Trial Demand……………………………………………………………………27

Prayer for Relief…………………………………………………………………..27

# Table of Authorities

**Cases**

Terry v. Ohio, 392 U.S. 1 (1968)

Establishes police officers needs to have reasonable suspicion that the person has committed, is committing, or is about to commit a crime and has a reasonable belief that the person "may be armed and presently dangerous" in order to not violate a person's fourth amendment Constitutional Rights for detainment.

Brown v. Texas, 443 U.S. 47 (1979)

Establishes just because someone is in a "high crime" area doesn't mean that is sufficient reasonable suspicion to detain the person.  Detaining appellant to require him to identify himself constituted a seizure of his person subject to the requirement of the Fourth Amendment that the seizure be "reasonable."

Martin v. City of Boise - 920 F.3d 584 (9th Cir. 2019)

An ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to them.

Baker v. State, 256 Ga. App. 75, 567 S.E.2d 738 (Ga. Ct. App. 2002)

Establishes being in a parking lot late at night in an area known to have crime is not grounds for reasonable suspicion.

Monell v. Department of Social Services of the City of New York (436 U.S. 658 (1978)

Municipality may be held liable for an officer's actions when the plaintiff establishes the officer violated their constitutional right, and that violation resulted from an official municipal policy, an unofficial custom, or because the municipality was deliberately indifferent in a failure to train or supervise the officer.

**Statutes**

42 U.S. Code § 1983

Establishes civil action for deprivation of rights.

NRS  207.200

Requires prior warning by owners of land/property or a no-trespassing sign to be posted for trespassing.

NRS 293.2546 ""Legislative declaration of voters rights"

**Constitutional Rights**

Fourth Amendment

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Eighth Amendment

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (Basis of Martin v. Boise)

Fourteenth Amendment

Requiring that states not infringe on a person's constitutional rights without due process.

## Introduction

**1.** I am suing City of Reno (a municipality) and Reno Police Department Officer Scott Gauthier (an individual - badge 16009) because I believe Officer Scott Gauthier racially profiled me (violation of 42 U.S.C. 1983 and Fourteenth Amendment), targeted me because of homelessness, and unlawfully detained me in violation of the Fourth Amendment of the US Constitution when he had no legal reasonable suspicion based off of the US Supreme Court's Ruling for <u>Terry v. Ohio</u> and <u>Brown v. Texas</u>.  I believe the targeting of homeless individuals when they are not doing anything illegal just to check to see if there are warrants is a violation of the Eighth Amendment because at some point this custom becomes harassment and homeless people are vulnerable enough.

## Jurisdiction and Venue

**2.** The incident with Officer Gauthier occurred on December 3, 2022 in Reno, Nevada. Since the violations of civil rights falls under federal jurisdiction and laws (federal question), the United States District Court for the District of Nevada (Reno Office) has proper jurisdiction and venue.  The following "federal questions" apply:

<u>42 U.S.C. section 1983</u> is a federal statute

<u>Eighth Amendment of the US Constitution</u> as it relates to: Martin v. City of Boise - 920 F.3d 584 (9th Cir. 2019)

<u>Fourth Amendment of the US Constitution</u> as it relates to: Terry v. Ohio, 392 U.S. 1 (1968) and Brown v. Texas, 443 U.S. 47 (1979).

<u>Fourteenth Amendment of the US Constitution</u> as it relates to racial profiling or assuming that "**people who sleep in their cars in this area do commit crime**" without due process.

**Parties**

**3.** <u>Plaintiff</u> is an Asian American male and is a citizen of the United States.  Plaintiff has been homeless for over a year.

**4.** All defendants are subject to this Court's personal jurisdiction:

**a)** <u>Defendant #1</u> is City of Reno (a municipality)

**b)** <u>Defendant #2</u> is Officer Scott Gauthier (an individual) who is employed as a police officer for the Reno Police Department serving the City of Reno.

**Background**

**5.** My civil and constitution rights were violated on December 3, 2022 at approximately 10:48 PM when Reno Police Department Officer Scott Gauthier (badge 16009) initiated contact with me at the parking lot of Planet Fitness located at  863 Northtowne Ln, Reno, NV 89512. At the time, I was sitting in my car on my computer video editing.  Gauthier knocked on my passenger side window, and I opened my door on my driver's side.

**6.** I explained to Gauthier I was video editing and even showed him my computer screen.  I also pulled up a PDF Complaint I had filed against Lyon County Sheriff Department to show Gauthier the part where it says "Terry v. Ohio" because I wanted to show Gauthier he could not legally detain me as I had not committed a crime, was not committing a crime and was not about to commit a crime.  In addition, I had hoped once I pointed out <u>Terry v. Ohio</u>, he would just leave me alone and not violate my civil rights.

**7.** Gauthier claimed he had reasonable suspicion to detain me because there was a lot of crime in the area, and there are a lot of people sleeping in their cars in the area.  Gauthier only spoke about generalities, and was not specifically investigating any crime and nobody had called the police on me on December 3, 2022 or prior for parking in the parking lot of Planet Fitness at Northtowne Lane which is open 24/7.  Gauthier's reasonable suspicion was crime can happen in this area.  Gauthier claimed that there was crime all the time inside and outside of Planet Fitness.  He stated it was a private property, and stated *"Do you have a right to be here?  If they want you to be.  Have they told me that they don't want you here?  Nope, not yet. They have not."*

2

**8.** I was not trespassing as nobody had asked me to leave on December 3, 2022 or previously, and in fact I have been a member of the 863 Northtowne Lane planet fitness since November 26, 2022.  Gauthier's argument for reasonable suspicion (that since it is allegedly a high crime area, and crime can happen here), is flawed and is in violation of the Supreme Court's Terry v. Ohio ruling.

**9.** I informed Gauthier that I would only give him my ID if it was required.  I asked Gauthier if I was detained and he said I was.  He told me providing my ID was required due to his reasonable suspicion of the area being high crime and crime can happen in the area.  I wanted to re-assert I was not providing my ID voluntarily, so I held up my ID and informed Gauthier, if he takes my ID from my hand, then it is required.  I was not voluntarily consenting to giving him my ID unless it was legally required.  I was scared if I did not provide Gauthier my ID, I would get arrested because he told me it was "required."  Gauthier took my ID out of my hand and asserted ID was required.  He then stated, "I just took it.  It's all recorded.  I just took it."

**10.** Gauthier then demanded I give him my social security number because the ID I gave him was my US Passport and dispatch couldn't run US Passports to check for warrants.  The US Passport has my name and date of birth but that was not good enough for Gauthier.  Gauthier informed me I had to also provide him either my social security number or driver's license number because dispatch can't run US Passports and he doesn't know if he could run US Passports either.  Since I was detained and Gauthier required me to provide my information, I did write down my Nevada Driver's License number on his notepad and stated my Nevada Driver's license number out loud to him.  I only did this because I was fearful if I did not comply, Gauthier would unlawfully arrest me even though I wasn't doing anything illegal and was unlawfully detained.

**11.** With my US Passport in hand, and Nevada Driver's License number, Gauthier went to his patrol vehicle and when he returned minutes later, he handed me back my ID and informed me I didn't have any warrants.  This confirms that Gauthier's unlawful Terry Stop was pretext in order to get my information to check me for warrants.  Gauthier violated the

Fourth and Fourteenth Amendments of the US Constitution by seizing me (detainment) and running my information for warrants.

12. Gauthier knew I was homeless and he did not offer me any information to get help as a homeless person.  He did not mention homeless shelters or any social services to me because his interaction was in no way a welfare check but instead to go finishing to see if I had warrants.

13. I informed Gauthier I wanted to make a complaint.  Officer Tyler Brooks (badge 16006) had recently arrived on scene and asked "For what?" in response to me saying I wanted to file a complaint.  I explained that crime in general was not reason to detain someone as Gauthier needed specific reasonable suspicion that I was about to commit a crime or had just committed a crime.

14. Gauthier tried to re-explain his reasonable suspicion for the detention by saying, *"Did I already explain that to you?  So I said from my training experience in this area from working this beat over a year and a half, people who sleep in their cars in this area do commit crime.  I have specific instances where that's true."*  What Gauthier said was again in violation of Terry. v. Ohio and Brown v. Texas because just because I sleep in my car and was in an allegedly high crime area does not mean I had just committed a crime, was about to commit a crime or was in the process of committing a crime.  I have no misdemeanor or felony convictions, and I have no warrants out for my arrest.

15. It is very important to note that nobody had asked me to leave the parking lot on or before December 3, 2022.  Nobody had called the police on me to initiate the police contact with Gautier on December 3, 2022.  Gauthier was not investigating any specific crime in the parking lot.  Taking into consideration all these factors and what Gauthier said about "people who sleep in cars in this area do commit crime" it is clear that Gauthier was prejudiced against me with no legal basis to detain me.

16. I asked Gauthier if he had talked to anyone else in the parking lot or if he was singling me out.  Gauthier admitted he just logged on that night and I was the first person he stopped.

**17.** The next day (December 4) I spoke to a few other homeless people in the parking lot, and none of them said they were contacted by the police in the parking lot.  The homeless people I spoke to all happened to be white.  It appears Gauthier targeted me specifically.  Before approaching a vehicle, police officers tend to run license plates for information.  I believe I was targeted for being homeless, discriminated against based on my race and had my constitutional rights violated when Gauthier unlawfully detained me.

<h3 style="text-align:center">Legal Argument</h3>

**18.** On December 3, 2022 Liu had never been asked to leave by anyone.  Gauthier took it upon himself to detain Liu in violation of <u>Terry v. Ohio</u> without legal reasonable suspicion.  Gauthier asserted that he had reasonable suspicion because it was a high crime area which has already been already ruled unconstitutional from <u>Brown v. Texas, 443 U.S. 47 (1979)</u>.  Gauthier was not investigating any specific crime, and he had no reasonable suspicion that Liu was about to commit a crime or had committed a crime.  After telling Liu he was detained (violation of the <u>Fourth and Fourteenth Amendments</u> on seizing the person without reasonable suspicion and/or due process), Gauthier demanded Liu's ID.  Liu did not consent to giving up his ID unless it was required under law.  Gauthier took Liu's ID out of his hand because Gauthier asserted it was required which is a violation of Liu's constitutional rights.  Since neither Gauthier or Reno Police Dispatch was able to run US Passports for warrants, Gauthier required additional information from Liu which was either his social security number or driver's license number.  Liu was parked and was not driving at the time of the interaction.  It was not a consensual encounter as Liu was detained and required to provide ID.  It was a pretextual encounter as a US Passport which already has Liu's name and date of birth was not satisfactory to Gauthier as he wanted to check Liu for warrants.  Gauthier knew Liu was homeless and sleeps in his car.  Gauthier was not doing a wellness check on Liu as none of his questions was about Liu's wellness and at the beginning of the encounter, Liu even explained he was video editing on his laptop (which is not a crime).  Gauthier chose to detain Liu and run him for warrants.  Gauthier provided no information for

homeless services whatsoever.  He did not call up a homeless shelter on Liu's behalf to check if there were beds available.  His mission was to run Liu for warrants in hopes of arresting Liu.  Although Nevada stop-and-identify laws require someone to identify themselves to officers, the law only requires them to carry identification while driving. Liu was not driving as he was sitting in a parked car.  Gauthier did not pull Liu over.

**19.** Liu was parked in the parking lot of a Planet Fitness which was open 24 hours a day.  He is a member of that gym.  As per <u>Baker v. State, 256 Ga. App. 75, 567 S.E.2d 738 (Ga. Ct. App. 2002)</u> being in a parking lot late at night in an area known to have crime is not grounds for reasonable suspicion.  Furthermore, it is unclear if the area is in fact a high crime area.  Liu went into Planet Fitness the next day and spoke to a receptionist who did not believe it was a high crime area.  She also disagreed that there was crime inside of Planet Fitness.  Liu even showed the receptionist the video he took of Gauthier.  I think the receptionist's name is either spelled Kyra or Kira.

**20.** <u>NRS  207.200</u> is Nevada's statute on trespassing.  Liu was not trespassing as Gauthier admitted *"Have they told me that they don't want you here?  Nope, not yet.  They have not."*  It doesn't appear anyone called the police on Liu on December 3, 2022 or prior to that at the Planet Fitness location.  It appears Gauthier took it upon himself to detain Liu for no valid legal reason.

**21.** After running Liu for warrants, Gauthier used the argument "people who sleep in their cars in this area do commit crime" to further convey he had legal authority to detain Liu and check him for warrants.  Although Liu was in a private parking lot and not on public property, <u>Martin v. City of Boise - 920 F.3d 584 (9th Cir. 2019)</u> relates to this lawsuit because it is clear being homeless is not a crime.  Gauthier did not inform Liu about any homeless shelters or social services.  Gauthier tried to generalize that because Liu sleeps in his car (homeless) "in this area" then Gauthier has reasonable suspicion to run Liu for warrants.  Liu was not trespassing on December 3, 2022.  Although there was signage that stated "No Overnight RV Parking," Liu was not in a RV.  Nobody had asked Liu to leave the parking lot in Northtowne Lane on December 3, 2022 or prior to that.  Gauthier never

asked Liu to leave the parking lot either.  Plaintiff considers Gauthier's unlawful detention of Liu and forcing Liu to provide information so Gauthier could run Liu for warrants to be police harassment.  Liu would have no problems if for example Liu was speeding and Gauthier pulled Liu over and demanded ID.  That would be lawful detention.  However, since Liu was not driving and was parked, Gauthier's unlawful detainment of Liu was harassment and bullying.

22. Liu was video editing on his laptop when Gauthier first approached Liu and knocked on his window.  Video editing is not a crime so therefore Liu was not committing a crime.  Being homeless is not a crime.  Sleeping in a car is not a crime.  Being in an allegedly "high crime" area is not a crime.

23. At the end of the encounter, Gauthier brought up a new argument accusing Liu that since Liu has been there for a while, he knows when businesses close and that is further proof or reasonable suspicion.  Google Maps knows when businesses close.  It is not uncommon knowledge for members to know Planet Fitness is open 24 hours a day.  Liu was parked in front of a Planet Fitness that is open 24/7 in which Liu is a member of.  Gauthier's unlawful detention of Liu and taking Liu's ID to check Liu for warrants is unconstitutional and a violation of Liu's civil rights.

24. The white people in the parking lot Liu spoke to on December 4, 2022 informed Liu they had not been contacted by the police in the parking lot.  Some of the white people Liu spoke to were in violation of the "No overnight RV parking" sign rules (because they were in vehicles that would be classified as such) and informed Liu they had not been contacted by the police.  Liu was not in violation of the "No overnight RV parking" sign as he was in a car and not in a RV.  Liu is not white and believes he may have been targeted based on his race given that it does not appear the police contacted the white homeless people in the parking lot Liu spoke with on or before December 4, 2022.

## Why Qualified Immunity Does Not Apply

25. Under this doctrine, police officers can act without fear of being sued as long as their conduct does not violate the victim's constitutional rights, which were so clearly

7

established that a reasonable person would have known them.  In this case, a reasonable person in the year 2022 would believe a police officer can not legally racial profile someone to detain them in order to get their information to run them for warrants without reasonable suspicion the person had just committed a crime, was in the process of committing a crime or was about to commit a crime.  Video editing on a computer is not a crime.  Being in an allegedly "high crime area" in the parking lot of Planet Fitness in Northtowne Lane when nobody had asked Liu to leave is not a crime, and is not reasonable suspicion to detain Liu to check him him for warrants.

**26.** Terry v. Ohio and Brown v. Texas has long been established by the US Supreme Court. Liu tried to stop Gauthier from violating his rights by first informing Gauthier he was video editing and pointing out that under Terry v. Ohio, Gauthier needed reasonable suspicion. Gauthier misrepresented what reasonable suspicion was in order to unlawfully detain Liu, and thus should lose his qualified immunity due to his discriminatory actions against Liu.

### How the Eighth Amendment Applies

**27.** Martin v. Boise is about cities can not criminalize homelessness when there is a lack of shelter beds.  Reno Cares Campus is often at capacity **(EXHIBIT H)**.  Since the Reno Cares Campus updates their estimated beds available around noon, by afternoon or evening, they may be full and there wouldn't be an update on the hosing bed estimate website.

**28.** Liu is not arguing that Reno needs to provide sufficient shelter for the homeless. However, he believes that due to the Martin v. Boise and the fact that Reno can not house all of the homeless, homeless individuals who are not committing any crimes should not be arbitrary targeted by the police in violation of Terry v. Ohio.  Liu was sitting in his parked car doing video editing.  He was not in violation of the anti-homeless "no overnight RV parking" ordinance as he wasn't in an RV.  There were RV type vehicles in the lot, but it does not appear that Gauthier approached them to harass the people in RVs that night.

Gauthier approached Liu because he targeted Liu based on race and that Liu sleeps in his car.

**29.** Gauthier's line of reasoning is that "people who sleep in cars in this area commit crime."  Homeless people are not all criminals.  After checking Liu for warrants, Gauthier admitted Liu did not have any.  Homeless people should not be subjected to illegal detainment in order to ID and run them for warrants as it is cruel and unusual punishment when there is no legal reasonable suspicion to detain them.  By doing so in violation of the law equates to police harassment and bullying and at some point could be considered cruel and unusual punishment to target people based on their existence.

**30.** The Gauthier incident is not the first time that a member of Nevada law enforcement detained Liu for being homeless.  Less than 30 days prior to the Gauthier interaction, Liu was detained by Lyon County Lt. Sheriff Ryan Powell.  The bodycam footage that the Reno PD has custody of will show that Liu referred to his Complaint filed against Lyon County Sheriffs Department to try to stop Gauthier from violating Liu's civil rights by bringing up Terry v. Ohio.  Liu's attempts to reason with Gauthier did not work as ID was required according to Gauthier.

**31.** If Gauthier and the Reno PD is allowed to illegally detain, ID and run the homeless for warrants, Plaintiff believes this violates the Eighth Amendment because it is quite cruel to assume any homeless or "people who sleep in cars in this area commit crime." Police fishing expeditions like this targeting the homeless is pretty much harassment and instills the homeless to try to avoid police.  Police are there to serve the community and if homeless are frequently and arbitrary harassed by the police for being homeless in order to run them for warrants, then it could not only psychologically impact the homeless but deter them from seeking help from the police when they are a victim of a crime.  There are news stories of homeless being attacked by random people.  Homeless people are already vulnerable and should not be harassed or bullied by the police when no crime is being committed.

**Reno Police and City Illegal Harassment of Vulnerable Population**

**32.** Plaintiff wants to make it clear that he does not do illegal substances and is not a harm to himself or others.  In addition, as confirmed by Gauthier on December 3, 2022, Liu did not have any warrants, and there was no specific reasonable suspicion against Liu that he had just committed a crime, was in the process of committing a crime or was about to commit a crime.  There was absolutely no legal basis to detain Liu.

Research has shown that homeless people are 9 times more likely to commit suicide:

Suicide rates among homeless populations are estimated at nine times that of the US general population (**112.5 suicide deaths per 100,000** versus the U.S. national average of 12.5 per 100,000; Centers for Disease Control and Prevention [CDC], 2014; Peate, 2013).

https://www.jstor.org › stable    ⋮
Dying in the Shadows: Suicide Among the Homeless - JSTOR

**33.** A culture of disdain and targeting the homeless because of unlawful biases that all homeless people are criminals in order to illegally detain, ID and run them for warrants is cruel and unusual punishment through police harassment and bullying of vulnerable populations.  Studies have shown when people are constantly harassed and bullied, they are more likely to be psychologically damaged and have a higher likelihood of suicide.  When some people are psychologically harassed, they may turn to drugs as a coping mechanism. When the harassment is too painful, some people may purposely overdose or attempt suicide.  While a reduction of the homeless population would benefit the city's budget, we are talking about lives and it is uncalled for to target homeless populations in order to harass them unlawfully in order to push them to leave Reno one way or another through anti-homeless practices.

**34.** Reno Police does not have a policy of going to wealthy majority white neighborhoods, knocking on people's doors, identifying and running household members for warrants when there is no reasonable suspicion of a crime.  If Reno PD did do that

10

thousands of times, then it is likely they will get a few arrests as there are wealthy and white people who commit crimes and may have outstanding warrants.  Just because some homeless people may commit crime and have warrants, does not mean police should treat them all as criminals.

35. At some point frequent bullying and harassment by police becomes cruel and unusual punishment because illegally detaining someone is using police force because police "lawful commands" need to be obeyed.  Should Liu have asserted his civil rights based on Terry v. Ohio and Brown v. Texas and refused to identify even though Gauthier said it was "required," Liu would have been arrested because Nevada is a "stop and identify" state.  Not only did Liu provide a passport stating his first and last name, Gauthier needed additional info to run Liu for warrants even though Liu was parked on private property.

36. It may be considered cruel and unusual punishment for Gauthier to require Liu to identify and provide Gauthier the information needed to run Liu for warrants when there was no legal basis for detainment under Terry v. Ohio due to what could have happened in Liu's circumstances if he had asserted his rights and stopped Gauthier from running Liu for warrants.  Liu knew the implications if Gautheir did not get what he "required."  It was a loose-loose situation where Liu needed to choose between advocating for his civil rights or being unlawfully arrested.  Ultimately, Gauthier would have arrested Liu if Liu refused what was "required."

## Why City of Reno is a Proper Defendant

37. The "Monell Doctrine" established under Monell v. Department of Social Services of the City of New York (436 U.S. 658 (1978) determined that a municipality may be held liable for an officer's actions when the plaintiff establishes the officer violated their constitutional right, and that violation resulted from an official municipal policy, an unofficial custom, or because the municipality was deliberately indifferent in a failure to

train or supervise the officer.  The City of Reno/Reno Police Department meets all of those requirements established under the Monell Doctrine.

## Official Written Policy

**38.** The Reno Police Department has official written policy that targets the homeless. One example is Reno Police's General Order for "HOMELESS PERSONS/H.E.L.P. PROGRAM."  See https://www.renopd.com/content/gen_ord/S-160-05%20%20Homeless%20Persons%20-%20%20HELP%20Program.pdf

**39.** The General Order is written in a way that appears to be prejudicial to the homeless with action items such as "Patrol and monitor downtown parks and greenbelt areas for homeless individuals and camps" which specifically target the homeless even though everyone has the right to visit and use these public areas (including the homeless) and as long as people are not breaking any laws, all classes of people (including the homeless) should not be specifically targeted with monitoring just because of their economic status.

**40.** The General Order also states, "Ensure that officers notify a supervisor when a homeless person is transported outside of the Department's geographical jurisdiction."  One can argue that pressuring the homeless to leave one city or county and go to another geographical region (especially in a different state) is unethical.  It is not surprising that Reno Police Department has a policy regarding transportation of homeless outside of the city's jurisdiction.  In the past, the news media covered Nevada's bussing of homeless to California.  See https://www.motherjones.com/politics/2015/10/nevada-settles-busing-homeless-lawsuit-san-francisco/

**41.** Nevada bussing of homeless echoes injustice especially when Texas and Florida governors have been bussing asylum seekers to NY and other states, and sometimes dropping the poor and tired off in front of politicians' homes which seems especially cruel to use asylum seekers as objects in a game of political posturing to gain status with their

constituents.  Although the Nevada to California bussing of homeless did not reach national headlines, it is still unethical.

### Official City Ordinances to Target the Homeless



**42.** The Planet Fitness Parking lot had a "no overnight RV parking" sign posted pursuant to city code RMC 8.22.100(23).  One can deduce that one reason for such a city code is that the City of Reno does not want homeless people parking overnight in RVs.  City Codes such as this target the homeless and pressure them to leave town.  Although Liu was not violating the ordinance as he was in a car and not an RV, the climate of discriminatory anti-homeless policies in Reno **(SEE EXHIBIT E)** was a contributing factor that enabled Officer Gauthier to believe he could violate Liu's constitutional rights and illegally detain Liu.

### Reno's Unofficial Custom Against the Homeless

**43.** There is a bunch of instances of discrimination against the homeless as covered by the media.

*"ACLU backs homeless advocates in fight against City, Reno police (video)"*

https://thisisreno.com/2021/09/aclu-backs-homeless-advocates-in-fight-against-city-reno-police-video/

*"Washoe County considering fines for illegal camping, raising fears for homeless"*
https://sparkstrib.com/2022/12/27/washoe-county-considering-fines-for-illegal-camping-raising-fears-for-homeless/

"Washoe County commissioners took first steps this week toward criminalizing unauthorized camping — a        move that would align the law in unincorporated areas with policies in Reno and Sparks, but that has been        criticized as being overly harsh to homeless people."

*"Chief, Mayor vow changes after police prevented reporters from covering homeless sweep"*
        https://thisisreno.com/2020/06/chief-mayor-vow-changes-after-police-prevented-reporters-from-covering-homeless-sweep/

Note: thisisreno.com appears to be behind a paywall, but their YouTube Channel is not behind such a paywall.  There is an alarming video about how Reno Police treat the homeless.
The video is available at: https://www.youtube.com/watch?v=Y8AbAQ8au-Y
Here is a screenshot detailing key moments which are alarming and quite prejudicial to the homeless:



Plaintiff watched some of the video and it appears the police officer was actively harassing and bullying a homeless woman.

### City's Failure to Train or Supervise

**44.** The City of Reno failed to train and supervise Gautheir who is a new officer who was hired in 2020.  Scott Gauthier and Tyler Brooks both have "new employee" dates of

06/09/2020 as per

https://www.renopd.com/formAdmin/content/pdfs_lib/2020RenoPoliceDepartment-AnnualReport_v11.pdf

**45.** At the time of the encounter, both Gauthier and Brooks had been on the job for only around 2 and a half years.  Each officer rode individually in their own patrol cars and did not have a partner.  Gauthier's disregard for Liu's civil rights points to problems in his training and supervision.

**46.** Reno police department has lowered their hiring standards over the years to make hiring officers easier.  Not only did they lower hiring standards for new officers, the City of Reno also lowered standards for police officers to be promoted to SGT.  Sergeants are critically important to train and supervise new police officers and if supervisors are inexperienced, that will trickle down to patrol officers like Scott Gautheir being not adequately trained and supervised to ensure they are not violating people's civil rights.

**47.** *City of Reno – Civil Service Commission Minutes for Thursday June 25, 2020 – 3:30 PM* (full PDF available at https://www.reno.gov/Home/ShowDocument?id=84625) includes letters of opposition to the City of Reno in regards to lowering standards for officers to be promoted to Sergeant.

**48.** Alan Saltler (President of Reno Police Supervisory and Administrative Employees (RPSAE) wrote, "The Reno Police Supervisory & Administrative Employees Association (RPSAE) would like to express our concern with the reduction of minimum standards for an officer to become a supervisor."

**49.** At the end of his letter he wrote, "we do believe that there are legitimate concerns that should be weighed when considering a change to the minimum qualifications to become a sergeant. In closing, we ask you all to maintain the minimum standards and encourage the department, as stated, to raise the applicants to the qualifications, rather than lower the qualifications to the applicant."  **(SEE EXHIBIT A)**

**50.** Brandon Cassinelli - Political Affairs for Reno Police Protective Association also wrote a letter in opposition to lowering standards to promoting patrol officers to supervisors **(SEE EXHIBIT B)**.  Here is an exert from his letter:

Duly appointed Members of the Civil Service Commission,

I sincerely apologize that my first interaction with yourselves as a governing body in my official position as a Board Member of the Reno Police Protective Association is one of dissent. I am writing you today on behalf of our Membership, the same men and women we all entrust with our safety in various but consistent ways.

The memorandum initialed by Director Mark Gregersen and submitted to your office on June 5th, 2020 from the Human Resources Division within the City of Reno referencing proposed changes to the standards of promotion for Police Sergeant is the major locus around which several important factors I cite here will revolve. Understanding that prior to this letter we were mostly strangers to one another, please allow me to briefly provide some background about myself and why I was entrusted to write this dissension.

Here is another exert:

*Due to a planned vacation, a Lieutenant who would normally serve as the watch commander for the swing and graveyard shifts on a Friday evening is absent. As an unfortunate result of attrition and budget, two Sergeants are often entrusted to manage the entire City's Police contingent and serve in the stead of the Lieutenant. A family emergency pulls away the Senior Sergeant with little time to prepare a replacement supervisor. The liability, optics, lives and personnel issues of the large swath of public safety responsibility endemic to policing the City is now squarely on the shoulders of a 26 year old Sergeant who received "C" grades in several of their Criminal Justice classes and whose pre-frontal cortex has only finished developing within the year.*

**51.** From looking at the letters of opposition, it is clear that standards should have been increased or kept the same instead of being decreased.  In addition, it looks like 94% of surveyed Reno police employees disagreed with "Sgt. Promotional Time Change." **(EXHIBIT C).**    Plaintiff believes that in light of George Floyd and Elijah McClain, the city of Reno should have increased police standards for hiring and promotion of police officers into supervisory positions instead of decreasing them.

### City's Hiring Practice s Resulted in Mostly White Male Force

**52.** At around the time Gauthier was sworn in as an officer, a Reno Gazette Journal article published on July 29, 2020 stated "In the past two years, the number of Black

officers has increased to seven from six and the number of Hispanic officers has increased to 37 from 21, Soto said. The number of Asian officers has increased to nine from seven." (source https://www.rgj.com/story/news/2020/07/29/reno-police-past-hiring-practices-resulted-mostly-white-male-force/5541967002/)  The article alleges Reno police past hiring practices resulted in overwhelmingly white, male force.

**53.** Scott Gauthier and Tyler Brooks are both white males.  The two SGTs who came to the scene some time later are also white males.  There is already a custom of "thin blue line" where it's "us vs. them" among police departments across the US.  In Reno's case, the "us" would be mostly white male police officers.  If Reno's police department was more diverse, perhaps Liu would not have been racially profiled and illegally detained.  (**SEE EXHIBIT D** for 2022 demographic data of sworn officers for the Reno Police Department).

## Lack of Auditing Supervision

**54.** The City of Reno's bodycam policy is to preserve it for only 15 days for contacts that does not result in citations, arrest or investigation.  This is a problematic policy because 15 days is not long enough.  The primary reason why Liu rushed to submit his lawsuit so fast was because of the Reno PD bodycam 15 day policy.  Liu understood should a lawsuit be initiated, then the rules of evidence means the city has to preserve the bodycam footage until the conclusion on the lawsuit.

**55.** Call centers in the US (and around the world) have a system of auditing where calls are audited for quality assurance to ensure employees are doing their jobs.  Reno's 15 day bodycam preservation policy means they aren't doing enough to ensure officers are supporting and defending the Constitution as they have been sworn in to do.  There is a high chance when homeless people are harassed by Reno PD, they do not complain.  Homeless are easy targets and disenfranchised and often times when police mistreat the homeless and violate their civil rights, it gets unreported.  Liu asked Gauthier and Brooks for a supervisor, and they refused to get one for Liu.  Liu ended up calling the Reno Police non-emergency number and eventually two white SGTs were dispatched to Liu.

17

**56.** Homeless people are already vulnerable and because Reno PD does not keep bodycam footage for over 15 days, it means they aren't randomly going over the bodycam footage to adequately audit their own officers for wrongdoing.  Based on how confident Gauthier was in his commands and disregard for Liu's civil rights, he probably wasn't expecting repercussions for what he did.

**57.** Many police departments in the US automatically keep all bodycam footage preserved for a longer duration and randomly audit the bodycam footage.  It appears Reno's 15 day bodycam preservation policy is intended to get rid of footage fast to reduce legal liability.  Liu was only informed about the 15 day policy after requesting and speaking to a Lieutenant on the phone.  Lawsuits take time to draft and file.

**58.** Lt. Clark of the Reno Internal Affairs Department informed Liu on January 25, 2023 that no body camera footage are randomly audited.  It appears the only times it is viewed is when there is an arrest, civilian complaint or an investigation.  Liu inquired about the primary reason why they aren't audited and Lt. Clark informed him that the Reno Police Department is not staffed to the levels they should have.  Liu speculated that Reno could have a third party do the auditing as cities such as New York have a civilian department that investigates the police.  Liu also speculated that a third party like Ernest and Young could be hired to do random audits.  Plaintiff believes a lot of disenfranchised groups such as homeless, the poor or minorities are less likely to file complaints.  Lt. Clark informed Liu that Reno Police Department policy prohibits a third party to audit the bodycam footage.  Liu inquired if there is a state law or constitutional law that prohibits it, and Lt. Clark told Liu that the policy of not allowing third parties is because of Reno Police Department policy.

**59.** It appears it is an internal decision within the Reno Police Department to 1) only preserve bodycam footage for 15 days (unless arrest, complaint or investigation) and 2) no random audits.  Plaintiff believes not having random audits allows officers to target groups or classes of people that are less likely to file complaints against the police knowing that their work won't be supervised in terms of random audits.  This is a problematic policy.

18

**60.** Liu asked when Sgt. Della sent over his police complaint to I.A. and Lt. Clark informed Liu it was sent over on December 20, 2022.  That is more than 15 days from the day Liu's rights were violated.  Liu took steps by contacting the City Attorney's Office to ensure the bodycam footage would be preserved.  Since it took Della over 15 days to send it to Internal Affairs.

**61.** The 15 days bodycam policy means evidence of civil rights violations will be deleted in most cases if it does not escalate upwards in time for the body cam to be preserved.  This allows officers a safety net and provides officers the loophole to know they can act unprofessionally and violate certain groups of people as they are less likely to escalate any concerns that would result in bodycam footage to be preserved beyond 15 days.

**62.** Reno's population has grew significantly since Covid-19 and with that also comes the benefit of additional tax dollars to the city.  Reno not hiring good officers, not training officers properly, lowering standards for promotion, and not having the amount of officers they should be at are all reasons why the city of Reno is negligent.

**63.** There is no state or federal law prohibiting a third party company or a board of civilians to audit police body camera footage randomly.  It is Reno's policy not to allow this.  Although there is state law that currently forbids non-citizens from becoming police officers, there is no state law that forbids non-police from being hired to audit police body camera footage at random.

**Reno PD Formal Complaint Policy**

**64.** Shortly after Liu's encounter with Gauthier, Liu called the non-emergency number because Liu wanted to file an official complaint and the dispatch took down Liu's phone number and Lieutenant Yturbide called Liu back.  Lt. Yturbide informed Liu that he could reprimand the officers, or if Liu went ahead with an official complaint, he would not be able to reprimand the officers.  Liu thought that was a shocking policy because why can't Liu file a complaint and also have the Lieutenant do his reprimand?  The Lieutenant

19

claimed he couldn't do both and Liu could either have him reprimand the officers or Liu could go file an official complaint.  Although the Yturbide did not tell Liu not to file a complaint, his wording and explanation made Liu believe he was trying to direct Liu not to file the complaint so the LT would just reprimand the officers.  Liu did not think that was a good enough to not file a complaint because why can't Liu do both?  Liu believed it was intended to get Liu not to file a complaint as wouldn't someone need to investigate something in order for the LT to reprimand the officers to double check on stuff?  The LT seemed too eager to offer his services to reprimand the officers to get Liu not to file an official complaint.  Liu wanted to file an official complaint but the LT refused to go to his location.  Liu then asked for a SGT and told the Yturbide he had video recorded of the incident so the LT dispatched 2 SGTS to bodycam videotape Liu's video recorded video footage.

65. Some days after, Liu called IA and spoke to a woman and told her about the weird policy where the LT could reprimand the officer or if he filed an official complaint, the LT could not.  She put Liu on hold and she spoke to someone to check on that, and she returned to the phone and told Liu what the LT Yturbide said was correct.  This policy of not allowing police supervisors to reprimand officers when someone also wanted to file an official complaint is bad policy because why wouldn't the Police Department want to reprimand their own officers and coach them on what they did wrong and also allow the victim to also file an official complaint as well?  If for example, a retail employee racially profiled a customer, and the customer wanted to file an official complaint, would the supervisor not do anything to reprimand the employee and also take the formal complaint?  This policy promotes "thin blue line" and code of silence.

### Elijah McClain and the escalation of Unlawful Detention

66. Elijah McClain was an African American male who was walking home after shopping at a store.  Three Aurora police officers detained McClain when he had not committed any crime and was not about to commit any crime.  Police did not have legal

reasonable suspicion to detain McClain but they choose to detain him anyway because he was a black man wearing a ski mask even though it was cold outside.  The police had the right to ask consensual questions but did not have the right to detain McClain.  Had the police understood wearing a ski mask when it is cold is not reasonable suspicion for detaining someone, then Elijah McClain would not have been killed.

67. When police officers racially profile and illegally detain individuals without valid reasonable suspicions, not only does it violate civil rights, but it also poses a danger to the individuals being detained because police officers carry weapons.  There is always a chance that the person being unlawfully detained who is not doing anything illegal or carrying any weapons end up being killed by the police especially when the individual is a non-affluent minority.

68. It is human nature there is a "fight or flight" response.  People respond differently when suddenly confronted by the police when they are not doing anything wrong.  While some affluent non-minorities might enjoy interacting with police, there is a growing percentage of minorities (especially poor minorities) who fear police even though they are law abiding citizens.  There are prejudicial customs within the police department and American police is heavily militarized compared to police of other countries.  There is always a possibility an unarmed detainee gets shot or killed by the police so therefore when Scott Gauthier illegally profiled Liu and unlawfully detained him, not only was Liu's civil rights violated, but it put Liu's life at risk because there was a possibility that Liu could have been injured or killed because Gauthier appears to lack good judgment and was bold enough to violate Liu's civil rights.

69. If police officers followed the Constitution and stopped illegally detaining people when there is no valid reasonable suspicion, the number of incidents when cops kill unarmed people would decrease.  There was no legal reason to detain McClain, but police did anyway.  Had Aurora police not illegally detained McClain, he would still be alive today.

**Past Racist Behavior  of Reno Law Enforcement**

**70.** "Students of Color Say They Feel Increasingly Unwelcome at UNR"

https://medium.com/the-reynolds-media-lab/students-of-color-feel-increasingly-unwelcome-at-unr-8f9a7eb3b032

"Examples of why this might be the case abound. In late 2017, the University issued apology statements due to the racist behavior of two UNR police officers, one involving a Halloween costume and the other a traffic stop."


**ACLU on Reno**

**71.** "Many municipalities responded by enacting harmful criminalization policies that reinforce false and harmful stereotypes about homeless people. Criminalization policies fail to address the root causes of homelessness, harm public safety, increase recidivism, breeds distrust between people experiencing poverty and law enforcement, and wastes needed public dollars."


**72.** "Criminalization policies are appear generally applicable all citizen is a municipality, but in practice are enforced as part of a custom and practice of driving homeless people from public spaces."  See **Exhibit E** for full PDF "ACLU Nevada Homelessness in the City of Reno" (January 30, 2020)

## Criminalization of Homelessness

- Criminalization policies are appear generally applicable all citizen is a municipality, but in practice are enforced as part of a custom and practice of driving homeless people from public spaces.

- The City of Reno currently has at least seven ordinances that criminalize homelessness:
  - Section 8.23.090 – Camping
  - Section 8.12.012 – Prohibition Against Sitting or Lying in Doorways
  - Section 8.12.015– Sitting or Lying Down on Public Sidewalks in the Downtown Reno Regional Center
  - Section 8.12.030 – Camping on Public Property in the Truckee River Corridor
  - Section 8.12.042 – Blocking of Sidewalks
  - Section 8.23.065 – Hours of Park and Recreation Facilities
  - Section 8.30.040 – Time, Place and Manner

4



**Reno Policies that Disregard the Poor**

**73.** "A developer tore down motels where poor residents lived. Why Reno did nothing to stop it."

https://www.rgj.com/story/news/2021/11/12/why-reno-didnt-stop-jacobs-entertainments-motel-demolitions/6396044001/

"*Reno has one of the worst affordable housing shortages in the U.S. Yet city officials let an out-of-state casino owner displace low-income residents so he could one day build an entertainment complex.*"

**New Reno city manager Doug Thornley on budget shortfall, police funding and homelessness**

**74.** There is an article https://mynews4.com/news/local/new-reno-city-manager-doug-thornley-on-budget-shortfall-police-funding-and-homelessness which includes a video.

**75.** "The difficulty I think that we face as a region besides the growing unsheltered population is that the Boise vs. Martin decision out of the Ninth Circuit that the Supreme Court declined to review does sort of set the perimeters for how we have to deal with that right?  We either have to provide a bed for every member of that population, which at present we can't do, or we have to be much more careful in the manner in which we enforce our camping ordinances.  You know I think that the difficulty for us is that so far we tried really hard to work as a region to come up with a solution to that issue, but we have fallen short." - Doug Thornley in August 2020 before he took over as City Manager for City of Reno.

**76.** From watching the video, there is a hint of disdain from Thorley over the Martin v. Boise 9th Circuit ruling.  He admits that Reno can not provide a bed for all of the sheltered population and the perimeters of the ruling limits their actions on dealing with the homeless population.  It appears Reno city leaders see homeless people as problems rather than constituents.

### Homeless seen as a Problem and not as Constituents (Voting Rights)

**77.** NRS 293.2546 - "Legislative declaration of voters rights" state:

9. To have nondiscriminatory equal access to the elections system, including, without limitation, a voter who is elderly, disabled, a member of a minority group, employed by the military or a citizen who is overseas.

**78.** Upon looking at the November 8, 2022 "Election Day Vote Centers" PDF from Washoe County Registrar of Voters **(EXHIBIT F)**, there are several locations in Reno (eg. schools, malls/centers), but none of them included the Homeless Cares Campus. Since Reno wants to round up and herd the homeless to pretty much a single location (and away from downtown where it is more pedestrian friendly) to a concentrated facility for the homeless far from the city center, perhaps it would be ideal to put in election day voting offices at the Cares Campus. That is if the city wants the homeless as voters and constituents with a voice.

**79**. There hundreds of homeless people at the Cares Campus, and maybe City of Reno doesn't want them voting in elections as they are seen as more of a problem to be dealt with instead of giving them a seat at the table as people instead of problems needing to be herded away from downtown where there are tourists.

### Conclusion of Why City of Reno is A Proper Defendant

**80.** Anti-homeless policies created by the city as outlined by Nevada ACLU shows that Reno has a problem with the homeless. Reno has official policies that target the homeless for surveillance. Reno Police have a history of dehumanizing the homeless including that "This Is Reno" YouTube video where a police officer harassed and bullied a homeless woman. The climate of the City of Reno and Reno PD looking down on homeless enables officers to violate homeless people's civil rights especially when police bodycam is not randomly audited and bodycam footage is only automatically preserved for 15 days when there is no complaint, arrest or investigation.

**81.** All of this leads to a climate of police feeling that they can do what they want towards the homeless as they are the voiceless and don't matter. This climate of hostility

towards the homeless coming from the leaders of Reno trickle down to the enforcers of Reno policy.  While Reno may express "feel good" double talk that make them seem like they care, they really don't.  Upon careful analysis of what Reno Mayor Hilary Schieve said about the homeless, it is clear that she is quite good at spinning things that are anti-homeless and wording it like it is an improvement **(SEE EXHIBIT G)**.

**82.** Lowering police standards, having a primarily white police force, not enough police supervision of officers, and lack of auditing to ensure the most vulnerable populations that are least likely to file police complaints have their rights protected results in patrol officers like Scott Gauthier thinking they can violate Liu's rights with immunity.

**83.** Homeless people are not all drug addicts, criminals or crazy.  Reno is not a city that pioneers change and equal rights.  It is a city that begrudgingly adapts to federal laws and rulings when they are forced to.  The City of Reno is liable for what happened to Liu because the City of Reno has failed to ensure accountability within the police and instead their policies encourage bad sentiment against the homeless.  The Reno Cares campus is run with bed bugs and Covid-19 is still a thing.  The health conditions for the homeless doesn't appear to be important.  In 2022, the city of Reno actually passed off the primary responsibility for Northern Nevada Homeless Services to Washoe County.  Reno has delegated away responsibility and oversight.  Reno leaders want the homeless to be hidden out of sight or to leave the area entirely and their anti-discriminatory polices help promote this agenda.

## PROOF OF ENCOUNTER

**84.** Liu has uploaded two "YouTube Shorts" videos that sum up the encounter. YouTube Shorts are similar to TikTok videos where videos are posted in vertical aspect ratio.  In addition, YouTube Short videos need to be 1 minute or less.  The two publicly posted videos that helps prove Liu's case can be viewed at:

**First "YouTube Shorts" video:** https://www.youtube.com/shorts/4uDHrel3OUs\
**Second "YouTube Shorts" Video:** https://www.youtube.com/shorts/MwDlPRFKppY



Shorts

Reno911! Detained for being
homeless #reno911 #police...
58K views

#reno911 Unlawful Detention
(Scott Gauthier) #police...
10K views

(Screenshot as of December 13, 2022 showing thousands of views on YouTube)

**Furthermore, Gauthier was wearing a bodycam, and the bodycam video can support Liu's claims**

← **Check-In History**

‹ December 2022

| | | |
|---|---|---|
| Dec 06 | 04:43 pm | Reno (Northtowne L... |
| Dec 05 | 09:30 pm | Reno (Northtowne L... |
| Dec 04 | 08:27 pm | Reno (Northtowne L... |
| Dec 04 | 03:16 am | Reno (Northtowne L... |
| Dec 03 | 02:07 pm | Reno (Northtowne L... |
| Dec 02 | 08:14 pm | Reno (Northtowne L... |
| Dec 02 | 03:23 am | Reno (Northtowne L... |
| Dec 01 | 03:26 pm | Reno (Northtowne L... |
| Dec 01 | 12:15 am | Reno (Northtowne L... |

(Proof of Planet Fitness Membership)

**Cause of Action**

1. Police misconduct

2. Unlawful Terry Stop detention

3. Discrimination

4. Violation of the Fourth and Fourteenth Amendments.  Possible violations of the Eighth Amendment.

5. Racial profiling

6. Illegal Terry stop under false pretenses with Gauthier requiring ID and interrogating Liu when Liu there was no suspicion Liu had committed a crime, was committing a crime, or was about to commit a crime.  Gauthier required ID and other information (Driver's License number or social security number) from Liu in order to run Liu for warrants.

7. Violating Liu's civil rights (42 U.S.C. Section 1983 claim)

8. City of Reno policies contributed to voter suppression in violation of federal law and also Nevada state law.

## Jury Trial Demand

Plaintiff requests jury trial.

## Prayer for Relief

Plaintiff requests the court grant the following relief:

A. Monetary relief of over $75,000 (with exact amount to be determined by jury trial).

B. Require all Reno Police Officers to attend a minimum of 10 hours of training in regards to citizens' civil rights and how to not infringe on these rights.

C. Have Reno Police Department Internal Affairs review all of Gauthier's traffic stops and detentions over the last two and a half years to check (that have not been deleted) and see if any of Gauthier's other traffic stops or detentions were unlawful, and to publicly release a report based on its findings.  This is critical because if any of Gauthier's previous stops and detentions were unlawful and led to arrest, then "derivative evidence doctrine" may apply.

D. Injunction for Reno Police Department to stop racial profiling, stop detaining citizens when there is no legal reasonable suspicion and stop the mentality that "people who sleep in their cars in this area commit crime" which is a violation of civil rights.

E. Require Officer Scott Gauthier to be trained on what reasonable suspicion is.  It would also be a good idea to send Officer Tyler Brooks to the same training since he was there and witnessed the end of the police encounter when reasonable suspicion was talked about again.

F. City of Reno to hire an outside third-party to randomly audit bodycam footage.

G. City of Reno to automatically preserve all police bodycam footage for 180 days at minimum.

H. City of Reno to provide election day voting booth inside the Cares Campus.

I. City of Reno to increase standards of new police recruits and to increase standards of police promotions to supervisor.


Respectfully submitted,

*Frank Liu*

Dated: 1/27/2023                    Frank Liu

Pro Se Plaintiff